Your honors, may it please the court. I'm Robert G. Ryan for Petitioner Andre Margo. I'd like to reserve two minutes for rebuttal, and I note there is no credibility issue in this case. Mr. Margo is a single 41-year-old native and citizen of Indonesia. He is ethnic Chinese and Christian. Because you're in a bad spot, I'd like to make a posit for you, which is that this case is a considerably stronger case. At least as to past persecution, and perhaps as to the likelihood of future persecution. Do you want to address the past persecution issue in this case? Certainly. He definitely was attacked based on his ethnicity. He testified in 1997 that he owned a shrimp farm in his native town and city of residence at that time, Ujung Pungdong, or Makassar. The country condition materials indicated at that time that there was a horrific riot, anti-Chinese riot, going on in Ujung Pungdong at that time. That's at page 137 of the record. That's the 1997 Indonesia country report. Well, both the IJ and the BIA, for some reason, focus on the question of whether the government was involved in this, which is not the question. It really isn't, Judge Berzon. And, of course, Sing V.I.N.S. says if the government is unwilling or unable to control certain groups, the group here would be native Indonesians. Not all native Indonesians hate the Chinese, but unfortunately many do because of the official discrimination that the government pursues in that country. He testified on September 17, 1997, native Indonesians seriously injured him on his shrimp farm during one of these riots. He testified that a native Indonesian man was attacking him. The man said, quote, you bastard, you Chinese, you don't understand, you are here just to visit as visitors, but you don't understand, end of quote. The native Indonesian man also said to the petitioner, to kill you is just to kill another chicken, end of quote. But the BIA and the IJ didn't say that that wasn't persecution or it was not substantively, but they said it wasn't persecution for purposes of the statute because the police didn't have any official involvement nor were they dismissive as an attempt to redress their vindication. Is that a valid basis for finding that he wasn't persecuted? In a word, no. Sing, B.I.N.S., and we briefed that case. It is on all fours. The statute says that if the country is unable or unwilling, and they may not have been unwilling, but they were unable. Absolutely. And Sing, B.I.N.S. confirms the statute. These people kept coming back to destroy his fresh shrimp farm. Yes, they did. Judge Brezan, yes, they did. He testified that during the attack, he suffered a knife wound on his inner bicep, which left a scar that he showed to the court and that he was trying to avoid the native Indonesian man with the knife. He fell off a small stool and shortly thereafter, native Indonesians hit his right leg with a wooden club and broke it. That's at the record at 73-75. So, one wonders. I tried this case and it was a remarkable decision, I must say, denying withholding of removal. Mr. Margo testified that he filed a police report regarding this invasion of his shrimp farm and his injuries. However, none of the perpetrators was ever investigated or accused, charged by Indonesian authorities. Again, the riots in Ujung Pangdong in 1997 were directed squarely against the ethnic Chinese. And that's the Indonesian country report. And that appears at page 137 of this record. He also said, he testified that in May 1998, his shrimp farm was again destroyed by the native Indonesians. And in May 1998, anti-Chinese riots occurred, of course, throughout Indonesia. He testified he wasn't present at the shrimp farm at that time, the time of the destruction. He testified he filed another police report regarding this incident, but that the police were unable to achieve any results. That's at page 48 and 49 of the record. So, there should have been a finding of past persecution in this case. But at a minimum, even if the judge doesn't find past persecution, he certainly satisfies the clear probability of persecution standard for withholding. To what extent does a disfavored group analysis work into your argument? Well, it certainly improves anyone's chances, including Mr. Margo's. There are judges who will look at this record and say, well, you don't have enough. If we have disfavored group analysis, and again, nothing precludes this court from applying that standard to this particular type of case, we would have perhaps had a different result. Well, you'd think it would go to the question of whether they were unwilling or unable. I mean, the fact that there is widespread persecution of this group, the notion that he has to demonstrate that they would dismiss the facts to him, rather than the fact that nationwide they're not succeeding in controlling this, seems to change the evidentiary burden. In other words, it ought to be relevant to demonstrate that they're unable to control it, because there's lots of it. Yes, and the record certainly indicates that. I would agree with you, Judge, that that ought to be the case. I would point out also, in the 2003 country report that the State Department found, there are more than 60 articles of law, regulations, or decrees that were, in effect, discriminated against the Chinese. Ethnic Chinese criticized government for not having done enough to investigate the 1998 violence against their businesses. Well, no wonder. They have state-sanctioned discrimination in Indonesia. State-sanctioned discrimination in the 21st century. That's what I asked in the earlier case, too, and I think it's applicable to both cases. And you don't have an answer as to why BIA didn't look into it or the IJ. Well, we certainly presented it. They have to consider it. We can't force them to consider it. We only present the cases, and we present them with a lot of vigor. So what are you asking us to do in this case? We're asking the court, again, to issue a published decision that would apply distributed group analysis to this type of case and to remand this case to the board. To do what? To consider what issue? To consider, again, the issue of withholding or removal and convention against torture relief, but using that. Do you think we could say that the substantial evidence here does not support the board's finding that there was not past persecution? That's certainly the case, Judge Pius. The court would certainly do that. We would still have to remand, because then the burden shifts. Theoretically, there's still an issue as to future persecution, but we could decide the past persecution on a current record, right? Certainly, you could. We would like a published decision, however, on extending distributed group analysis. In one of the cases, not all of them. In all three of the cases. But your primary concern right now is getting relief. Yes, it is. Absolutely. And consistent with that, Judge Pius, is the fact that distributed group analysis, and nothing precludes this court from applying it, extending it, would certainly help all of the three cases. You have a minute left.  See, this is Mr. Robbins, sent in as a substitute here. Yes. Good morning, Your Honors. It may please the Court. My name is Jonathan Robbins, and I'm here on behalf of Michael McKayze. There's two of you. Having heard us all of our ruminations, do you have anything to add on the question of the application of distributed group analysis? I do. I do. I do, Your Honors. Certainly, my colleagues spoke a little bit about the different burdens of proof, but I think it's a little more important to analyze that further than so far has been done. Because with respect to, when you look at what the disfavored group analysis is, the legal result of disfavored analysis is lowering the threshold of showing individualized persecution. And Your Honors have pointed out, you've sort of asked, well, if it lowers the 10% with well-founded fear, why doesn't it lower the 50% with clear probability of future persecution? And one of the reasons, if I'm not mistaken, the 10% was established in this circuit's decision, correct? Or, okay, it was? In court. Okay, I see. Well. Well, first of all, SAIL. But you want to know. When SAIL talked about it, okay, let's assume SAIL said, we don't know exactly what percentage disfavored group changes with respect to withholding a removal, but let's say it's 5% and you've got that 10% showing in well-founded fear. I mean, it's difficult because we don't have that percentage, but if you apply that to withholding a removal, then what are we saying? We're saying you have to have a 45% showing? It should be taken into account, and in these cases, it was not. Well, if you look at what the immigration judge did here, he said, you know, he acknowledged that members of, you know, that other Chinese people in Indonesia have faced persecution. But that's kind of the point. It's not really, the disfavored group analysis isn't really relevant. First of all, why isn't it relevant in this case, which is different than the others, to the question of whether the government was unable or unwilling? I mean, it's fairly shocking to begin with that they said that the government wasn't unable or unwilling. Whether they were willing or not, they certainly were unable because these people kept coming back. And he, but more than that, knowing that this is going on all over Indonesia, would certainly tell you something about whether they were unable, whether or not they were unwilling. Well, respectfully, Your Honor, I disagree that the evidence here shows that they were unable to control the mob. First of all, if you read his account in the written statement accompanying the applications for relief, when he talks about what happened, he says he was attacked by the mob. And then before he fainted, somebody said, move away, move away. And then he wakes up in the hospital. That means at some point, somebody stopped the mob from further going after him and somebody got him to the hospital. We don't hold government. Who's the someone? We don't know who the someone is. But there's also evidence which indicates that they were conducting investigations to try and find out what happened in the mob. That's an attempt to control the mob violence, to go after the people that may have been involved in other mob situations. And it's not informative that there's still mob violence against Chinese Christians all over Indonesia, despite whatever they're doing? When we say that we're looking as to whether or not they're able to control, we don't hold the Indonesian government or the Indonesian authorities to a perfect standard where they stop every single incidence of mob violence that happens. The question is, based on the evidence in this record, is the only way the immigration judge could have come out to say that, oh, yes, they were unable to control? What about the country conditions evidence? The general country conditions evidence is not relevant to that? Well, he acknowledged that the immigration judge acknowledged that. Can you show me where he acknowledged it? If you'll just give me one second to grab that. Go ahead. It says on page 49 of the administrative record, it would appear that at least in the 1997 and 1998 occurrences, the respondent, along with many other persons of his ethnicity, was the victim of mob violence. So they're acknowledging here that this isn't an isolated mob occurrence. They're not ignoring what's going on in Indonesia. But again, the question is... They are, because then they go on and say that despite what else was going on, he wants some evidence of official involvement with regard to him, or official dismissiveness of the respondent's attempts to seek redress or vindication. Well, that goes... He's not giving any weight to the larger situation. Well, he did. He mentions that other people... This is the same problem we had in the other case. He mentions it only to dismiss it, to not give it any effect. Well, that's because... Okay. I mean, he doesn't dismiss it. He takes it into account, but he says in light of the individualized evidence in this situation, it doesn't apply. In this individualized situation, we have the petitioner going to the Indonesian authorities. We have evidence which specifically speaks to his involvement and whether or not they were assisting him, whether or not they were discriminatory to him, whether or not they were discourteous to him, whether or not he received treatment. This is what he says. The record does not indicate any official involvement in that violence, which isn't relevant, or any official dismissiveness, which might go to willingness, but it doesn't go to the ability of them to control it, even if willing. Again, the ability to control is not a perfect standard whereby they stop all mob violence from happening. They obviously didn't stop all mob violence. It was all over the place. That's why it's relevant to know that it was all over the place. I mean, what country could immediately stop mob violence when somebody gets attacked right away? It couldn't, but these people were still the subject of persecution. In other words, you're looking at it as if this is a false standard. It's not a false standard. The question is whether this person should have to go back there to a circumstance where he'll be in danger because the government, however well-intentioned, can't stop the fact that as a member of the group that he's a member of, he's at risk. It's not a fault problem. Okay. Part of the problem was with the nature of what happened to Petitioner because when he was attacked by mob violence, he didn't get information to the Indonesian authorities whereby they could punish the people who had been involved in the first mob violence. That's why later on he was attacked because they never actually got their investigation with respect to that first mob violence never panned out. And again, we don't hold the Indonesian government to a perfect standard of being able to stop all persecution. I know it's true. The question is, is this person in danger if he goes back? That's the question. Well, again, the question isn't whether or not he's in danger. The record is whether or not the record compels the conclusion that the immigration judge was wrong and that he didn't establish a clear probability of persecution. And given the evidence of all his positive, well, I would say, with all the evidence with his involvement with the Indonesian authorities, I don't think it can be said that it's more likely than not that he's going to be persecuted. Obviously, you know, I'm not trying to argue that he didn't undergo outrageous mistreatment in Indonesia. I mean, I think we can all agree on that. But you have to be able to show that the government either condones it, that they're willing to ignore it, or that they're not able to control it. And he hasn't shown that they weren't able to control it here. He's shown that they were certainly trying to control it, and that based on the facts of this case, they weren't able to control it in this case because he didn't give them enough to go on with respect to their particular investigations. But again, it's his burden to show that everything will be all right if he goes back? Well, he's never actually alleged that the Indonesian government was unwilling to control it, or at least he didn't within his facts. I think what it is that they have to worry about, right? I mean, what happened to him and what happened to others close to him. Pretty good evidence to me. Again, honestly, you can go both ways on the evidence, but if you can go both ways under the standard of review. That's precisely why it matters whether you're taking into account the larger circumstance in which we can call disabled group analysis or we can call something else. But the fact that this is widespread and that it isn't being controlled is certainly relevant to whether they're able to control it. Well, respectfully, it's not. You can't lower the 50 percent. Somebody's lowering the 50 percent burden. But that's what the leading results of the disfavored group analysis is. It's saying... Look, I'd like to think of it this way. You're not lowering the 51 percent to 45 percent or to 40 percent. It makes it easier for the petitioner to meet his ultimate burden of 51 percent. He can point to so much more. Okay. Port his claim of individualized persecution. But then... And in the board's decision, they just say right out... In this case, it's abundantly clear what the board said, because they say, however, such analysis, i.e., disfavored group analysis, only applies to the relief of asylum. All that's... They just say crystal clear. See Lo Long and Sayle. Yes. They just flat out misread our cases. But that doesn't mean... I don't think that's a misreading of those cases. But, again, with the disfavored group... Do me a favor and point to me a part of Sayle and Lo Long where we say that. Well, you don't say it. It wasn't addressed... Why do you say that it's not a misreading of those cases? Because it's a blatant misreading of those cases. Well, I respectfully disagree, Your Honor. I don't think it's a... That's fine. Well, with respect to... We'll have a friendly disagreement. Very well, Your Honor. And with respect to the application of disfavored group analysis to convention against torture, that in itself is a different beast because that is, first of all, torture is completely... They have to prove that it was widespread torture, not just widespread persecution, for sure. Right. And as far as I understand, there's no pattern or practice regulation with respect to the... It's only for asylum and withholding or removal, if I'm not mistaken. Do you give any meaning to the sentence I was reading before where they say that the burden on withholding is higher and less flexible, essentially? Why do they say that? Well, it's less flexible. The Supreme Court has clearly defined what clear probability is. It's more likely than not that... I understand the higher part. Well-founded fear is a vague standard. It's akin to totality of the circumstances, which is why it allows for the creation of a disfavored group analysis underneath it. We used to joke in law school that whenever you have a totality of the circumstances, the court can do whatever it wants, so to speak. You can create a test underneath the totality of circumstances to determine what meets that standard. And well-founded fear is a vague circumstance. It's a very vague standard. Clear probability is not... As it says, they use the word elastic. It's not bendable. You have to show that it's more likely than not. It's a different type of standard, which is why the disfavored group analysis shouldn't apply. But I see I'm out of time, Your Honor, so I've gone over. We appreciate your argument. Thank you very much for your time, Your Honor. We have one minute. Well, I think we're just about exhausted. I believe so, too. I was going to give you a speech for you and say, we want a published opinion. We would also refer the court respectfully to our regulatory analysis in a reply brief of this case, consistent with that request, Judge Prezant. We did allege, actually, that the authorities couldn't protect Mr. Margo, and we pointed that out in our brief at pages 12 and 13 in the opening brief. It does not matter whether the government agents were involved or whether they were not. We cited the Singh case on the government being unwilling or unable to control those groups. So with all of that, if there are any questions, I'll entertain them, obviously. But if there are not, we will submit the case, and thank you very, very much. We do appreciate all the arguments on these cases. Very helpful. Thank you, Judge Prezant. Judge Barrett. Okay. Margo v. McCasey is submitted. Okay, we're going to pick up. Move next to Rohwer v. Salt River Project Agricultural Improvement and Power District. Okay. In this particular case, Mr. Rohwer has decided not to appear. So without the benefit of anything to respond to, we might have a few questions for the appellee, Mr. Egbert, representing the appellee.
judges: Paez, Berzon, Baer